UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Marc Henretta,

              Plaintiff,                     Case No.:
                                                Hon.

     vs.

FCA Group LLC,

              Defendant.

---

Michael L. Pitt (P24429)
Channing Robinson-Holmes (P81698)
Pitt McGehee Palmer & Rivers PC
Attorneys for Plaintiff
117 W. 4th Street, Suite 200
Royal Oak, MI 48067
(248) 398-9800
mpitt@pittlawpc.com
crobinson@pittlawpc.com

---

**COMPLAINT AND JURY DEMAND**

Plaintiff Marc Henretta brings this action for wrongful discharge and civil rights violations under the Family and Medical Leave Act ("FMLA") and Michigan's Persons with Disabilities Civil Rights Act ("PDCRA") against Defendant FCA Group LLC ("FCA") and states as follows:

**JURISDICTION, VENUE, AND PARTIES**

1.    This wrongful discharge case asserted by Mr. Henretta is based on disability discrimination and retaliation brought pursuant to the Family and

Medical Leave Act ("FMLA"), 29 U.S.C. 2601, and Michigan's Persons with Disabilities Civil Rights Act ("PDCRA"), MCL 37. 1101 *et seq.*

2.       The jurisdiction of this Court over this controversy is based on 28 U.S.C. §1331, to enforce the provisions of the FMLA.

3.       This Court also has supplemental jurisdiction under 28 U.S.C. § 1367 to address the claims brought under Michigan's PDCRA because they are so related to the federal law claims that they form part of the same case or controversy.

4.       Venue is proper because the events giving rise to this action occurred in this district and division, and all parties reside in or operate within this district.

## STATEMENT OF FACTS

5.       On November 5, 1984, Plaintiff Marc Henretta began his long and distinguished career in marketing and sales at FCA.

### Mr. Henretta's Disability

6.       In October of 1989, Mr. Henretta was involved in a motorcycle accident that left him a paraplegic.

7.       Mr. Henretta took a short-term medical leave of absence in order to treat his injuries.

8.      Upon Mr. Henretta's return to work, until the date of his termination, he required intermittent leave from work in order to cope with medical conditions related to his paraplegia, such as digestive problems and related stomach pain.

9.      On average, Mr. Henretta was absent from work due to digestive issues and stomach pain related to his paraplegia between 12 and 20 times per year.

10.     Mr. Henretta utilized his vacation days for most, if not all, of Mr. Henretta's absences caused by digestive issues and stomach pain.

11.     Mr. Henretta further underwent approximately nine surgeries to treat medical conditions related to his paraplegia.

### Mr. Henretta's Distinguished Career at FCA

12.     Over the course of Mr. Henretta's career, he excelled in his work routinely receiving glowing praise from peers and his superiors and outstanding performance evaluations, which, in turn, earned him several promotions, raises in his salary, and bonuses.

13.     Mr. Henretta was devoted to his career at FCA and agreed to relocate five times in order to meet company needs.

14.     In 2005, Mr. Henretta was promoted to the position of Manager of Retail Advertising and held this position until his termination in 2019.

15.    As a Manager of Retail Advertising, Mr. Henretta was responsible for coordinating with advertising agencies to develop advertising campaigns to meet brand goals for a particular FCA vehicle brand.

16.    From approximately 2006 to 2008, Mr. Henretta managed the retail advertising for the Chrysler brand.

17.    In recognition for Mr. Henretta's excellent performance, in or around 2009, Mr. Henretta was tasked with handling the retail advertising for the Jeep brand and its six vehicles.

18.    Advertising for the Jeep brand required the most responsibility and held the highest prestige of the brands, because it routinely achieved between 50,000–72,000 retail sales per month, compared to the Chrysler Brand that typically made 8,000 -10,000 retail sales per month.

19.    Mr. Henretta excelled in this position receiving consistent excellent evaluations and yearly merit increases to his salary.

20.    Mr. Henretta was highly valued by his supervisors who made him an "Ambassador" to serve as a mentor to new employees.

21.    Mr. Henretta also served as a distinguishing member of the FCA Diversability Team throughout his disabled years at FCA and at the time of his firing he served on the board of a newly formed FCA diversity initiative headed-up by FCA's Diversity Group.

22.     Mr. Henretta further garnered considerable positive publicity for FCA through his regular participation in company sponsored charity events and interviews, with publications like Forbes Magazine, during which he discussed working at FCA as a paraplegic.

23.     One such company sponsored event that Mr. Henretta participated in, earning FCA significant positive publicity, was The Dodge Million Dollar Challenge in which he cycled, with his hands, more than 620 miles to raise money for the Challenged Athletes Foundation in 2011, 2012 and 2013.

### Mr. Henretta's New Supervisor Discriminates Against and Harasses Mr. Henretta

24.     In the Summer of 2017, Bruce Velisek ("Velisek") was named to the position of Director of Retail Marketing and became Mr. Henretta's supervisor.

25.     Within a week of becoming Mr. Henretta's supervisor, Mr. Henretta met with Velisek and disclosed that he required intermittent leave in order to deal with digestive issues and stomach pain related to his paraplegia.  At that point, Velisek did not state any problems or concerns.

26.     Immediately upon becoming Mr. Henretta's supervisor, Velisek began treating Mr. Henretta in a hostile and disparate manner by, among other things:

   a.  Frequently yelling at Mr. Henretta;

b. Issuing unjustified complaints about Mr. Henretta's job performance, such as, his work product "sucked" and was "the poorest" in his group, though Mr. Henretta continued to receive praise from his peers and positive performance evaluations;

c. Making public degrading statements about Mr. Henretta and his performance;

d. Treating Mr. Henretta in a cold and distant manner wholly unlike the manner he treated Mr. Henretta's peers making it nearly impossible for Mr. Henretta to perform his job responsibilities;

e. Questioning Mr. Henretta's peers as to what work he was performing suggesting he was lying about what he reported to Velisek;

f. Purposefully singling out Mr. Henretta in front of his peers in order to embarrass him; and

g. Purposefully excluding Mr. Henretta from extracurricular outings to which Mr. Henretta's peers were invited.

27.   In or around July or August of 2017, Velisek humiliated Mr. Henretta in front of his peers saying, "Marc, I'm going to have to bump you off this shoot. That way I know I'll come back with all the right shots," though Mr. Henretta had been successfully handling the brand and never had any issues with a commercial shoot.

28.   In or around September of 2017, Velisek removed Mr. Henretta from a commercial shoot and instructed him to return home a day early. Velisek never permitted Mr. Henretta to return to a commercial shoot again, making it

difficult for Mr. Henretta to perform his job responsibilities. Meanwhile, Mr. Henretta's peers continued to attend commercial shoots.

29.     Upon information and belief, Mr. Henretta is the only Manager of Retail Advertising to be sent home early from a commercial shoot.

30.     In or around August or September of 2017, Velisek removed Mr. Henretta from the Jeep brand, despite his successful handling of the brand and assigned him to the Chrysler brand.

31.     Unlike the Jeep brand, Chrysler only had one vehicle to advertise.

32.     By contrast, Velisek assigned several brands, including Dodge, Fiat, and Alfa Romeo, to a new hire whom Mr. Henretta was mentoring.

33.     In or around February of 2018, Mr. Henretta again received an excellent performance evaluation, a rating of "5," for the 2017 work year.

34.     Following Mr. Henretta's outstanding performance evaluation, on or around February 26, 2018, Velisek told Mr. Henretta, "You see this 5 on your review? You wouldn't have gotten that without the calibration process [referring to the company's peer review evaluation process] **because I think you're stupid and lazy."**

35.     Despite his excellent evaluation, Mr. Henretta did not receive a raise in his salary, though he had received annual raises in the preceding three years.

36.     On or around March 23, 2018, in the midst of a meeting amongst Mr. Henretta's peers, Velisek turned to Mark Malmstead, Head of Dodge Brand Operations, and loudly asked, **"Hey, can you take Henretta off my hands? He's terrible."**

## Mr. Henretta Complains of Discrimination

37.     Learning of Velisek's public comment, Mr. Henretta sought out guidance from Human Resources ("HR") and spoke with HR Business Partner Kristen Welch ("Welch") about Velisek treating him differently than his non-disabled peers.

38.     Mr. Henretta told Welch that Velisek was bullying and discriminating against him because of his disability and that Velisek treated him adversely in comparison to his peers.

39.     On April 13, 2018, Mr. Henretta followed up with Welch writing a lengthy email to her about how Velisek's behavior was unchanged, that he suspected he was being retaliated against for his earlier complaint to Welch, and he was consequently going to issue an internal complaint of discrimination and harassment with the Equal Employment Opportunity Compliance Office ("EEO Compliance Office").

40.     Shortly thereafter, Mr. Henretta met with Welch and Valencia Deloach ("Deloach") from the FCA EEO Compliance Office and complained that Velisek treated him in a hostile manner because of his status as a paraplegic.

41.     On June 25, 2018, the FCA EEO Compliance Office issued a finding that there was insufficient evidence to support a conclusion of discrimination.

42.     Following Mr. Henretta's complaints to Human Resources and the FCA EEO Compliance Office, Velisek's behavior continued and worsened.

43.     Velisek purposefully excluded Mr. Henretta from meetings and off-site extracurricular events to which his peers were invited, and repeatedly questioned whether Mr. Henretta was performing his responsibilities.

44.     Velisek also began tracking Mr. Henretta's comings and goings.

45.     Velisek did not track the comings and goings of Mr. Henretta's peers.

46.     In the Fall of 2018, Mr. Henretta circulated a newspaper article highlighting his involvement in a drag racing event to management, including Chief Marketing Officer Olivier Francois ("Francois"). Approximately ten minutes later, Velisek, who was not copied on the e-mail, emerged from his office pounding his chest and mockingly said to Mr. Henretta, "Did you hear back from Olivier yet? I did and you won't be!"

47.     Upon information and belief, Francois and HR directed Velisek and management personnel not to communicate with Mr. Henretta after he complained to FCA's EEO Compliance Office of discrimination.

48.     In the Fall of 2018, Mr. Henretta again met with Welch and a FCA EEO Compliance Office representative and complained that management, including Francois, was retaliating against him for issuing his previous complaint of discrimination by excluding him and not communicating with him, citing the aforementioned exchange with Velisek.

49.     Human Resources and the EEO Compliance Office failed to conduct an effective investigation into Mr. Henretta's allegations and issued a finding, on December 18, 2018, that management had not retaliated against him.

### Mr. Henretta is Terminated and Advised it is Due to Absences Related to his Disability

50.     Within a few weeks, on January 17, 2019, Welch met with Mr. Henretta and advised him that his attendance record from the previous year, during which he had been absent as a result of his digestive issues and stomach pain, was unacceptable.

51.     Mr. Henretta informed Welch that his absences were largely due to digestive issues and stomach pain related to his paraplegia and were typically covered by vacation days.

52.    Welch did not inquire as to what accommodations Mr. Henretta may need in order to cope with his disability or advise Mr. Henretta of his right to intermittent leave under the FMLA.

53.    In March of 2019, Mr. Henretta began to suffer from significant pain in his hands as a result of degeneration related to his paraplegia.

54.    Mr. Henretta consequently missed approximately ten days of work in March of 2019 due to the pain in his hands and stomach pain for which he sought medical treatment.

55.    Following Mr. Henretta's return to work, Velisek and Welch met with Mr. Henretta and alleged that his attendance issues were affecting his performance but failed to provide any specific examples because this was simply untrue.

56.    Throughout the course of his career of more than thirty years, Mr. Henretta never received a disciplinary action for poor performance.

57.    On April 1, 2019, Welch and Velisek met with Mr. Henretta and issued him a Final Written Warning with regard to his attendance warning that he would be terminated from his position following his next absence.

58.    Most, if not all, of the absences cited in Welch's April 1st letter were related to Mr. Henretta's disability.

59.    Mr. Henretta's absences did not affect his job performance.

60.    Mr. Henretta did not incur more absences in 2018 and 2019 than he had in previous years.

61.    Mr. Henretta's peers were not issued disciplinary letters despite being late or absent in 2018 and 2019.

62.    During the April 1, 2019 meeting, Mr. Henretta explained that the absences he was being penalized for were due to stomach pain and his hands, both of which were related to his disability.

63.    Mr. Henretta further advised Welch and Velisek that he was scheduling surgery on his wrists in order to deal with the issues he was experiencing with his hands.

64.    FCA later approved Mr. Henretta's application for short-term disability, which excused several of his March 2019 absences, but FCA did not pay him for these days unlike absences in prior years.

65.    Following the April 1, 2019 meeting, Velisek completely shut out Mr. Henretta refusing to speak with him or relay assignments, while continuing to speak with and relay assignments to his peers.

66.    Mr. Henretta's hands continued to degenerate and cause him significant pain in April of 2019, which rendered him unable to dress himself, wheel his chair, and come into work.

67.    Mr. Henretta continued to advise Velisek for the basis of his absences.

68.    On April 25, 2019, Welch e-mailed Mr. Henretta repeating that his absences, which were related to his disability, were unacceptable.

69.    Welch's April 25th e-mail further required that Mr. Henretta submit FMLA paperwork in relation to his hands within ten days or face termination.

70.    On May 10, 2019, Mr. Henretta submitted his FMLA paperwork with regard to his hands and FCA subsequently approved him for intermittent leave under the FMLA.

71.    At the time Mr. Henretta submitted his FMLA paperwork covering his hands, Welch did not inform Mr. Henretta that his digestive issues and stomach pain, related to his paraplegia, may be a qualifying medical condition under the FMLA and entitle him to intermittent leave.

72.    In June 13 of 2019, Mr. Henretta was late to work due to car trouble. Velisek did not believe that Mr. Henretta had car problems.

73.    On June 17, 2019, Mr. Henretta was absent from work due to digestive issues and stomach pain related to his paraplegia.

74.    On June 18, 2019, Welch issued Mr. Henretta a Last Chance Warning advising him that his next unauthorized absence would result in his termination.

75.    In a meeting with Velisek and Welch on June 20, 2019, they informed Mr. Henretta that he had been approved for intermittent medical leave under the FMLA with regard to his hands, but that he would not be paid for absences covered under FMLA.

76.    Mr. Henretta had always been paid when absent from work before Velisek became his supervisor.

77.    On July 26, 2019, Mr. Henretta was absent from work due to stomach pain related to his paraplegia.

78.    On July 28, 2019 and July 29, 2019, Mr. Henretta advised Velisek and Welch that his hand surgery had been scheduled for August 13, 2019.

79.    On August 5, 2019, Velisek and Welch met with Mr. Henretta, at a 1:00 p.m. scheduled to discuss Mr. Henrett'a upcoming August 13, 2019 surgery, and terminated his employment citing as the basis for his termination his absence of July 26, 2019, on which date Mr. Henretta had been absent because of digestive issues and stomach pain related to his paraplegia.

80.    Mr. Henretta's termination was just eight days before his scheduled surgery, which Welch and Velisek were fully apprised of, and for which Mr. Henretta had been approved for short-term disability.

81.    Mr. Henretta's termination was motivated by animus on the basis of disability and in retaliation for opposing a violation of his civil rights,

requesting accommodation for his disability and requesting medical leave under the FMLA.

82.     FCA could have accommodated Mr. Henrett'a disability by, among other things, allowing him to work remotely and take medical leave, without suffering undue hardship.

## COUNT I
## VIOLATIONS OF THE FAMILY AND MEDICAL LEAVE ACT ("FMLA")

83.     Plaintiff incorporates by reference all the allegations contained above as though stated in full herein.

84.     At all times relevant hereto, Plaintiff was an employee and Defendant an employer within the meaning of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §2601, *et seq.*

85.     Plaintiff fell within the protection of the FMLA as a person with a serious health condition. 29 U.S.C. §2612(a)(1)(C).

86.     At all times relevant hereto, Plaintiff suffered from a serious health condition in that he had a physical condition that required continuing treatment from a healthcare provider.

87.     Under the FMLA, Defendant had an obligation to inform Plaintiff of his rights under the FMLA.

88.   Under the FMLA, Defendant had an obligation to provide Plaintiff with up to 12 weeks of continuous or intermittent leave for a serious health condition which rendered Plaintiff unable to perform the functions of his position.

89.   In addition, Defendant is prohibited under the FMLA from retaliating against Plaintiff for requesting and/or taking FMLA leave.

90.   Notwithstanding Defendant's duties as set forth above, Defendant willfully violated the FMLA by failing to inform Plaintiff of his rights under the FMLA, failing to provide Plaintiff with intermittent leave to cope with his paraplegia, and by terminating Plaintiff's employment for requesting and/or taking FMLA leave.

91.   As a direct and approximate result of Defendant's violations of the FMLA, Plaintiff has and will continue to be deprived of wage loss, fringe benefits, status, seniority, and other advantages of employment; Plaintiff has, and in the future, will experience mental anguish, humiliation, and embarrassment, resulting from Defendant's violations of the FMLA.

Accordingly, Plaintiff requests the following relief:

a.   An order reinstating Plaintiff to his former position or a comparable position;

b.   An Order of this Court awarding Plaintiff liquidated damages in accordance with the FMLA;

c.   An Order of this Court awarding Plaintiff compensatory damages in an amount in excess of $75,000.00 he is found to be entitled to;

d.   An Order of this Court awarding Plaintiff interest, costs, and attorney fees;

e.   An Order of this Court awarding Plaintiff such other equitable relief as this Court deems just and equitable.

## COUNT II
## VIOLATIONS OF MICHIGAN'S PERSONS WITH DISABILITIES CIVIL RIGHTS ACT ("PDCRA")
## (Disability Discrimination, Failure to Accommodate and Retaliation)

92.   Plaintiff incorporates all of the foregoing allegations by reference as though stated in full herein.

93.   At all relevant times, Plaintiff was an employee and Defendant was an employer within the meaning of Michigan's PDCRA, M.C.L. §37.1101, *et seq*.

### Disability Discrimination

94.   The PDCRA makes it unlawful for an employer to discriminate against a qualified individual because the individual has a disability, a record of a disability, or because the employer regards the individual as disabled.

95.   At all times relevant to this action, Plaintiff was a qualified individual with a disability pursuant to the PDCRA who, with or without accommodation, could perform the essential functions of his position as a Manager of Retail Advertising.

96.    Plaintiff was an individual with a disability within the meaning of the PDCRA, in that he had a physical impairment that substantially limits one or more of his major life activities, who with or without accommodation could perform the essential functions of his job with Defendant and/or Plaintiff had a record of such a disability and/or was regarded by Defendant as having such a disability.

97.    Plaintiff's disability was paraplegia.

98.    Notwithstanding said duties as set forth above, Defendant discriminated against Plaintiff because of his disability and/or because it regarded Plaintiff as disabled and/or because Plaintiff had a history of a disability when it terminated Plaintiff's employment.

**Failure to Accommodate**

99.    The PDCRA further requires employers to engage in a meaningful interactive process with employees with regard to reasonable accommodations.

100.   At all times relevant hereto, Defendant had a duty under the PDCRA to accommodate Plaintiff for purposes of employment unless the accommodation would impose an undue hardship. Defendant's duty to accommodate Plaintiff includes, but is not limited to, providing Plaintiff with medical leave.

101.   At all times relevant hereto, Defendant could have accommodated Plaintiff's disability without suffering an undue hardship.

## Retaliation

102.   At all times relevant hereto, Defendant had a duty not to retaliate against Plaintiff with respect to his employment, compensation or terms, conditions or privileges of employment, or to limit, segregate, or classify Plaintiff for employment in any way which deprived or tended to deprive Plaintiff of employment opportunities or otherwise adversely affect the employment status of Plaintiff, in retaliation for his requesting accommodation and/or complaining of disability discrimination.

103. Notwithstanding said duties as set forth above, Defendant retaliated against Plaintiff for requesting accommodation and/or complaining of disability discrimination when it terminated his employment.

104.   As a direct and approximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer lost wages, and other economic advantages of employment; Plaintiff has and will continue to suffer mental anguish, humiliation, , embarrassment, and emotional distress, loss of status in his chosen profession, and pain and suffering.

Accordingly, Plaintiff requests the following relief:

a.  An order reinstating Plaintiff to his former position or a comparable position;

b.  An order awarding Plaintiff compensation in an amount he is found to be entitled to;

c.  An order awarding Plaintiff interest, costs, attorney fees and litigation expenses as provided for under the PDCRA;

d.  An order granting Plaintiff such other relief as the court deems just and equitable.

Respectfully submitted,

Pitt McGehee Palmer & Rivers PC

By: /s/ Channing Robinson-Holmes
Michael L. Pitt (P24429)
Channing Robinson-Holmes (P81698)
Attorneys for Plaintiff
117 W. 4th Street, Suite 200
Royal Oak, MI 48067
(248) 398-9800
mpitt@pittlawpc.com
crobinson@pittlawpc.com

Dated: February 19, 2020

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Marc Henretta,

        Plaintiff,              Case No.:
                                          Hon.

    vs.

FCA Group LLC,

        Defendant.

---

Michael L. Pitt (P24429)
Channing Robinson-Holmes (P81698)
Pitt McGehee Palmer & Rivers PC
Attorneys for Plaintiff
117 W. 4th Street, Suite 200
Royal Oak, MI 48067
(248) 398-9800
mpitt@pittlawpc.com
crobinson@pittlawpc.com

---

## **JURY DEMAND**

Plaintiff herein demands a trial by jury of all issues to the within cause of action.

Respectfully submitted,

Pitt McGehee Palmer & Rivers PC

By: /s/ Channing Robinson-Holmes
    Michael L. Pitt (P24429)
    Channing Robinson-Holmes (P81698)
    Attorneys for Plaintiff
    117 W. 4th Street, Suite 200
    Royal Oak, MI 48067
    (248) 398-9800
    mpitt@pittlawpc.com
    crobinson@pittlawpc.com

Dated: February 19, 2020

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Marc Henretta

**(b)** County of Residence of First Listed Plaintiff ___Oakland___
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Channing Robinson-Holmes (P81698)
Pitt McGehee Palmer & Rivers PC
117 W. 4th Street, Suite 200
Royal Oak, MI 48067   (248) 398-9800

## DEFENDANTS
FCA Group LLC

County of Residence of First Listed Defendant ___Oakland___
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
      Plaintiff

☒ 3  Federal Question
      *(U.S. Government Not a Party)*

☐ 2  U.S. Government
      Defendant

☐ 4  Diversity
      *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 840 Trademark | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | **LABOR** | **SOCIAL SECURITY** | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | Relations | ☐ 864 SSID Title XVI | Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 751 Family and Medical | | ☐ 891 Agricultural Acts |
| | ☐ 362 Personal Injury - | Product Liability | Leave Act | | ☐ 893 Environmental Matters |
| | Medical Malpractice | | ☐ 790 Other Labor Litigation | | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement | **FEDERAL TAX SUITS** | Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | Income Security Act | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | Agency Decision |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☒ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | State Statutes |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original
    Proceeding

☐ 2 Removed from
    State Court

☐ 3 Remanded from
    Appellate Court

☐ 4 Reinstated or
    Reopened

☐ 5 Transferred from
    Another District
    *(specify)*

☐ 6 Multidistrict
    Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1367

Brief description of cause:
Disability discrimination

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A **CLASS ACTION**
  UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE   February 19, 2020

SIGNATURE OF ATTORNEY OF RECORD   /s/ Channing Robinson-Holmes

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____